AUGUSTA INSURANCE COMPANY *v.* SAMUEL PACKWOOD.

Citation to appear, or an actual appearance in court, is indispensable to affect the rights of a party by judicial proceedings, except in the case of creditors, where the law has declared public advertisement of notice to them to oppose an account, equivalent to citation.

*Samuel Packwood* and his wife *Alice*, changed their residence from Louisiana to New York in 1836, where they continued to remain until the death of the wife in 1840. While they resided in New York, the husband sold the property, which is the subject of this controversy, to *Stewart*, who agreed to pay in annual instalments, and gave his six notes for the purchase money, and stipulated for the privilege of canceling the sale at any time before the final payment of the whole purchase

money, upon a proper allowance of indemnity to the vendor. After the death of the wife the pro- Augusta Ins. Co.
perty was reconveyed to the vendor, in consideration of the return of the six notes which had been       *v.*
given for the price. It was admitted that the property when sold by *Packwood*, was a part of the  Packwood.
community. The heirs of Mrs. *Packwood* claimed that the re-acquisition of the property enured
in part to their benefit, while *Packwood* maintained that it enured to him alone. *Held :*

1. The notes having been received by *Packwood* in New York, where he and his wife were domiciled,
and being there in his possession after her death, whether a half interest in those notes vested in
the wife's heirs—Quære ?

2. The decision of *Packwood's* succession, 12 Rob. 369, on the subject of the rescission of the sale from
*Packwood* to *Stewart* affirmed.

3. On the death of his wife *Packwood* ceased to represent the community. He took the title in his
own name and for his individual account. If the heirs of his wife had any claim, it was not
against the property, but against *Packwood*, to compel him to account for their funds converted
to his own use.

4. To effect a rescission of the sale so as to replace parties in the same position as if a sale had never
been made, the parties to the sale and the rescission should be the same. Per *Slidell*, C. J., *Camp-bell*, J., and *Voorhies*, J., concurring.

The stipulation which is proved to have existed, securing to the purchaser the privilege of canceling
the sale at any time before the final payment of the purchase money, upon proper allowance of
indemnity to *Packwood*, the seller, did not render the contract null. The right to cancel the sale
depended upon a proper allowance of indemnity to *Packwood;* and this was not a potestative
condition. Per *Ogden*, J., *Buchanan*, J., concurring.

The plantation and slaves in Louisiana, it is admitted, continued to belong to the community, not-withstanding the removal of the husband and wife to New York. The notes for the purchase money
represented the price of the property, and the community must be considered as entitled to the
price, as being owners] of the property sold. If the price had been paid before the death of the
wife, the husband might have disposed of it as he pleased, but as it remained unpaid, the heirs had
the same right to the price that they would have had to the property if it never had been sold ;
and as the consideration of the retrocession to *Packwood* was the canceling of all the notes, con-stituting the whole price, he must be considered as having undertaken to represent the heirs of his
wife, and as having their title reinvested as well as his own. *Ogden*, J., dissenting, *Buchanan*,
J., concurring in the dissenting opinion.

The dissolving condition when accomplished, operates a revocation of the obligation, and places
matters in the same state as though the obligation had never existed. C. C. 2040.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J.
   *C. Roselius*, for plaintiff and appellants :

The great and important question before alluded to, recurs, what was the
effect of the retrocession of the property by *Stewart* to *Packwood* so far as the
rights of the community are concerned ?

I confidently contend that by the retrocession of the property on account of
the inability or failure of the purchaser to pay the price, the parties were re-placed in the same situation as if the sale had never taken place, and the pro-perty reverted back to the community, to which it is conceded it belonged
when the sale took place.

The principle upon which this rule is founded is familiar. Article 2040 of
the Code provides that—

"The dissolving condition is that, which when accomplished, operates the
revocation of the obligation, placing matters in the same state as though the
obligation had not existed." The next article provides that—

"A resolutory condition is implied in all commutative contracts, to take
effect in case either of the parties do not comply with his engagement ; in this
case the contract is not dissolved of right, the party complaining of the breach
of the contract may either sue for its dissolution, with damages, or if the cir-cumstances of the case permit, demand a specific performance."

And Article 2539, reiterates the rule with regard to the contract of sale—

" If the buyer does not pay the price, the seller may sue for the dissolution
of the sale."

---

*This sale and reconveyance is made for and in consideration of the sum of one dollar, and of the
return and delivery to him, the said *David Stewart*, of six promissory notes amounting to one hun-dred thousand dollars, recited and mentioned in the aforesaid act of sale from the said *Samuel Pack-wood* to the said *David Stewart;* the receipt of which said sum and the delivery to him of the afore-said notes, the vendor hereby acknowledges. Extract from conveyance of *Stewart* to *Packwood*, of
the 9th October, 1843.

In the case of *Powers*, Tutrix, etc. v. *The Ocean Insurance Company*, 19 L. R. 30, the Supreme Court say—

"By the effect of the implied resolutory condition in her sale on credit, to *Frederick*, the plaintiff was restored to the possession and ownership of the property, as if no sale or transfer had taken place."

This was an action on a policy of insurance alleged to be avoided by the sale of the property insured. There had been such a sale, but the purchaser being unable to pay for the property, made a voluntary retrocession of it to the vendor. Judgment was rendered in favor of the plaintiff. The rule is, "*genene-raliter resolutio fit ex tunc.*"

So in the case of *Mortee* v. *Roach's Syndic*, 8 L. R. 83, Judge Martin delivering the opinion of the court, observes—

"A sale is a synallagmatic contract which imposes on the vendor, the obligation of delivering the thing sold, and requires of the vendee the payment of the price. In the case of reciprocal obligations, the party who does not perform his part of the engagement, cannot avail himself of any rights resulting to him from the contract; consequently, the other party may demand the rescission of the contract from the defaulting party.

"The insolvent debtor, not having paid the price, was not the absolute owner of the slaves; and his right to the property was, therefore, not indefeasible.

"The cession or surrender of the insolvent debtor's rights, for the benefit of his creditors, could not and did not, change the character and nature of those rights. They remained the same; for the debtor could only cede the rights he had, and in the condition they were at the time. What was conditional and defeasible in his hands, did not become absolute and indefeasible in the hands of his creditors. The plaintiff did contravene the order staying all proceedings against the person and property of the insolvent, by exercising his rights against the syndic.

"The slaves in controversy, not being the absolute property of the ceding debtor, and his defeasible rights to them being annihilated by the rescission of the sale, it follows they make no part of the property surrendered; and their price cannot be diminished, or they in any manner held liable by the Syndic of the insolvent's estate for the costs and charges of the *concurso.*"

The most satisfactory exposition of the whole doctrine as to the effect of the dissolution of the contract of sale on account of the non-payment of the price, is found in the works of Troplong. In his commentaries on the Napoleon Code, (1654,) he says:

Parlons des effets de la résolution.

651. La résolution replace les parties dans l'état où elles se trouvaient avant la vente.

Il suit de là que le vendeur doit reprendre la chose franche, libre et exempte de toutes les hypothèques et autres charges dont l'acheteur l'avait grevée pendant sa jouissance; car la résolution s'opère ici *ex causâ primœvâ et antiquâ, et ex necessitate pacti impressi in ipsa rei traditione.* J'ai exposé cette théorie dans mon commentaire sur les *Hypothèques.*

Toutefois, le vendeur doit exécuter les baux faits sans fraude par l'acquéreur. La règle de l'art. 1673 trouve ici son application. Elle est trop juste pour ne devoir pas être acceptée par anologie.

652. De vendeur a droit de répéter contre l'acheteur tous les fruits perçus. C'est la décision de Neratius.

"Lege fundo vendito dictâ, ut si intrà certum tempus pretium solutum non sit, res inempta sit; de fructibus, quos interim emptor percepisset, hoc agi in-intelligendum est ut emptor in eos sibi suo quoque jure perciperet. Sed si fundus revaenisset. Aristo existimabat venditori de his judicium in emptorem dandum esse: quia nihil penès cum residere oporteret *ex re in quâ fidem fefellis-set.*"

C'est aussi ce que décident Julienus et Paul dans les lois 7 §§ 1 et 12, Dig. *De condict. causâ datâ non secuta.*

La raison en est que la résolution du contrat produit un effet retroactif, et que l'acquéreur, dépourvu de bonne foi et refusant de remplir ses obligations, manque d'un juste titre pour faire ses fruits siens.

Que si le vendeur avait reçu une partie du prix, il devrait en tenir compte à l'acheteur, il devrait même faire raison des intérêts de cette portion du prix,

sans préjudice, néanmoins, des dommages et intérêts qui pourraient être dûs par ce dernier. En effet, le vendeur ne peut retenir les intérêts, puisqu'il recouvre les fruits. Il ne doit pas non plus préférer les intérêts du prix au fruits de la chose; car la résolution, faisant tomber la vente, entraine dans le même néant le prix et les intérêts qui sont l'accessoire du prix. A la vérité, il serait presque toujours plus avantageux pour le vendeur de toucher des intérêts au denier vingt que de rentrer dans les fruits qui, en général, ne dépassent pas trois et demi pour cent. Mais, en demandant la résolution, il doit en subir les conséquences, il n'est pas possible que la vente soit tout à la fois annulée et productive d'intérêts de prix.

Au reste, la possibilité qu'ont les juges de condamner l'acheteur en des dommages et intérêts peut offrir le moyen de venir au secours du vendeur et de rétablir le niveau entre les fruit et les intérêts."

In the case of *Fulton* v. *Her Husband*, 7 R. R. 75, the Supreme Court expressed its opinion on the question whether the rescission must necessarily be sued for, in the most explicit terms.

"The re-transfer made to the plaintiff, in 1835, by *Morrison*, cannot be viewed in the light of a purchase made during the marriage. He voluntarily did that which his vendor could have obtained by bringing against him an action to rescind the sale, on account of his failure to pay the price. The land became the property of the petitioner, in the same manner, as if the sale to *Morrison* had been judicially rescinded; and she held it by the title which she had before her marriage, as though no sale had been made. It therefore now belonged to the community.

See also, 12 Toullier, p. 318, No. 195.

The most recent and conclusive authority on this point is that of *Felicia Chrétien* v. *John G. Richardson et al*, 7 Ann. p. 2, *et seq.* This case was most elaborately argued and kept a long time under advisement. The whole subject is reviewed by the court with great care, and although Chief Justice Eustis dissented, it will be seen that that dissent was in relation to a question which does not arise in the present case, i. e. whether an extra judicial rescission or retrocession can effect the rights of creditors who have acquired mortgages on the property retroceded. It is also to be observed that the closest analogy exists between the cases so far as the form of the contracts and the substantial facts are concerned. In that case as in this the rescission or retrocession was in the form of a sale. In that case the part of the price which the purchaser had paid was compensated by the revenues he had received; in this case *Stewart* has not paid one dollar, except nine thousand one hundred and fifty-seven dollars and twenty-eight cents which *T. J. Packwood, Stewart's* co-proprietor, who carried on the plantation, received out of *Stewart's* portion of the revenues of the plantation, and the sum of four thousand one hundred and ninety-two dollars and fifty-five cents, which was paid by *Lambeth & Thompson*, likewise out of *Stewart's* share of the proceeds of the sale of the crops of the plantation, under the garnishment in the attachment suit before alluded to. So that it appears very clearly that all the money which *Samuel Packwood* received from *Stewart* formed a portion of the nett revenues yielded by the plantation, and the whole of which belonged to *Packwood* on the retrocession of the property. The learned counsel for the appellee endeavored to give a different coloring to the state of facts than it really presents, by asserting that "in addition to these payments, *Stewart* deposes, that *Packwood* having obtained a judgment against him for a part of the price, it was agreed that he should pay to *Packwood* $2,800, and execute a sale of the plantation to him, and that *Packwood* should return the notes given for the price." But the gentlemen seem to have forgotten that this sum of twenty-eight hundred dollars was agreed to be paid by way of compromise, on account of six thousand dollars which *Stewart* had received and retained out of the revenues. *Packwood's* letter to *Donaldson* refers in the most explicit terms to this fact. In that letter, be it said, *en passant*, Mr. *Packwood* not only evinces considerable diplomatic skill, but also a correct understanding of his legal rights. He seems to have known very well that on the retrocession of the property, *Stewart* was bound to account for all the revenues he had received from it.

I might swell the number of authorities on this subject to an almost indefinite extent, for all the writers agree that on the retrocession of the contract on account of the non-payment of the price, all the parties must be replaced in

AUGUSTA INS. CO. precisely the same situation as if no sale had ever taken place; and that on the
*v.* retrocession of the property the purchaser is obliged to render an account to
PACKWOOD. the vendor of the fruits which he has or ought to have received.  But I shall
content myself by calling the attention of the court, in addition to the authori-
ties already cited, to what Marcadé, the ablest and clearest of all the commen-
tators of the Napoleon Code, says on the subject; vol. 6, p. 292, Article 1656
of the French Code :

"Quant aux effets de la résolution, ils consistent, on le conçoit, à remettre
les choses au même état que si la vente n'avait pas eu lieu (Art. 1183).  En
conséquence, l'acheteur doit restituer le bien avec les fruits s'il y en a eu, ainsi
qu'une indemnité pour les dégradations qu'il a pu causer.  De son côté, le ven-
deur doit rendre la portion de prix qu'il aurait reçue, ainsi que les intérêts
quand on lui restitue des fruits.  On objecterait en vain que si l'art. 1652
oblige l'acheteur à payer les intérêts de son prix quand la chose est frugifère,
la loi n'en dit point autant du vendeur, et qu'il n'y a point, en effet, analogie
entre les deux cas.  L'analogie, au contraire, nous parait complète, puisqu'il
s'agit, d'un côté comme de l'autre, de ne pas laisser à la même personne les
fruits du bien et les intérêts du prix, et que le vendeur ne doit pas plus s'enri-
chir au préjudice du vendeur.  Et le vendeur ne pourrait même pas retenir ou
se faire payer les intérêts, en abandonnant les fruits à l'acheteur; car ces fruits
sont rarement aussi considérables que les intérêts, et puisque les choses doivent
être mises au même état que s'il n'y avait pas eu vente, ce sont donc les fruits
du bien qui appartiennent au vendeur et non les intérêts du prix.  C'est avec
raison qu'une décision contraire a été cassée par la Cour Suprême  (Cassat.
d'une arrêt de Lyon, 23 Juillet, 1834.  Dev. 34, 1, 620)."

In opposition to this view of the subject, the learned counsel for the defen-
dant rely on "the authority of the decision already made in this cause in 12 R.
R. 266, and on the reasoning of Judge Bullard, then the organ of the court."

Notwithstanding the respect which I entertain for the memory of that able
Judge, candor compels me to say, that the decision given by him in the *Pack-
wood* case is by no means calculated to add to his judicial fame; and I am sure
that I am not hazarding much in affirming that no court, in which law is admin-
istered as a practical science, will ever be deluded by the specious tissue of
sophistry by which the ingenius Judge attempts to support his decision.

Let us, for a moment, subject the reasoning of the learned Judge to the test
of examination.   He states his argument as follows:

" It is contended that on the  canceling of the sale to *Stewart* by *Packwood*,
the property reverted back to *Packwood* in the same manner as if it never had
been sold.  But it must not be forgotten that, at that time, Mrs. *Packwood* had
been dead several years; that *Packwood* no longer represented the community,
much less the heirs of his wife, and could not, without their consent, reinvest
in them a title to one-half the property, which they  assert belonged  to Mrs.
*Packwood* before her death."

" There is no doubt that, in cases of retrocession, properly speaking, the ef-
fect is to reinvest the title as if no alienation had taken  place.  But that pre-
supposes that the capacities of the contracting parties remain unchanged.  Now,
according to the pretensions of the heirs of Mrs. *Packwood*, her right to one-
half of the notes, representing the price of the plantation, become, on her
death, irrevocably vested in her heirs; and we repeat that *Packwood* ceased to
represent a community, and the heirs of the wife."

Now, is it not obvious to the most ordinary understanding, that the whole of
this reasoning proceeds upon a *petitio principii ?*  The learned Judge assumes
that there was no retrocession, properly speaking, and then  gravely concludes
that the title was not reinvested, as if no alienation had taken place.  But why
was there no retrocession, properly speaking ?  We are told, because *Packwood*
had ceased to represent a  community and the heirs of his deceased wife.   Let
me ask, in what capacity *Packwood* acted when he sold the plantation to *Stew-
art ?*  Surely, as the representative of the community which existed between
himself and his wife.  And is it not equally indisputable that, at the date of
the sale, the plantation and slaves formed a part of that community ?  If these
two facts are undeniable, is it not self-evident that if no sale had been made to
*Stewart*, or to any one else, during the lifetime of Mrs. *Packwood*, the planta-
tion and slaves would have belonged to the community ?  That such would have
been the case no one will or can deny.  Then, what is the difference with re-

gard to the character of this property, resulting from the fact of no sale having Augusta Ins. Co.
been made during the existence of the marriage, and of an alienation and re-
trocession, which replaces the parties and the property in the same situation as
if no sale had ever taken place? But we are told by the learned Judge, that
*Packwood* no longer represented the community ; but it is obvious that, whether
he had the legal right of representing the community and the heirs of the wife
or not, he did, in point of fact, assume that right in consenting to the rescission
of the contract of sale of community property ; and the only parties who can
question the exercise of that power have ratified his act by claiming a title to
the property under it.

Again, it is said that on the death of Mrs. *Packwood*, the notes which *Stewart*
had given for the price of the plantation became the property of *Samuel Pack-
wood*, according to the laws of New York; and that, therefore, in returning
these notes as a consideration for the retrocession, he gave that which belonged
to him individually. Hence it is argued, with apparent sincerity, that the pro-
perty which was received for these notes necessarily belongs to him. The
fallacy of this argument is as apparent as that which we have just examined.
Promissory notes are nothing more than evidence of a debt. Now, the cancel-
ing of the contract of sale from *Packwood*, as the representative of the com-
munity, to *David Stewart*, of the plantation and slaves in question, produced
the same effect as if the notes had never been given, and as if no debt had ever
been contracted. What, then, becomes of the quibble that the notes formed
the consideration of the retrocession? The misapplication of words cannot
change the nature and substance of things. By virtue of the retrocession the
notes given by *Stewart* for the price of the plantation are considered, in con-
templation of law, as never having existed. *Quod nullum est nullum producit
effectum.*

It is next urged that there is an error lying at the very foundation of the po-
sition assumed by the plaintiff's counsel. It is assumed by him that there was
a simple rescission of the sale, by agreement, between the vendor and vendee—
that there was what the French lawyers call a *désistement.* The evidence in
the cause shows this assumption to be entirely erroneous. The sale was consum-
mated by a delivery, and *Packwood* received on account of the price, under
attachment proceedings, the sum of $4,192 55 from *Lambeth & Thompson*, and
$9,157 27 from *T. J. Packwood.* In addition to these payments, *Stewart*
deposes that *Packwood*, having obtained a judgment against him for a part of
the price, it was agreed that he should pay to *Packwood* $2800, and execute a
sale of the plantation to him, and that *Packwood* should return the notes
given for the price,

This objection has already been anticipated in another part of this argument.
It has been shown that *Stewart* never paid one cent on account of the price,
except from the nett revenues yielded by the plantation during the time he
remained the owner of it; and that it was agreed by way of compromise that
he should pay the sum of $2800 on account of the six thousand dollars which
he had received and retained of the revenues. It has also been shown that the
rule of law is clear that on the retrocession *Stewart* was bound to account to
*Packwood* for all the nett revenues. In this respect there is not the slightest
difference between the case of *Chrétien* v. *Richardson* and that now before
the court.

It is next insisted that the consequences contended for only flow from the
rescission of the contract when it has been judicially pronounced, either by suit
or exception. The same objection was made and overruled in the case of
*Chrétien* v. *Richardson.* It is plain that the construction which the counsel for
the defendant gives to Article 2041 of the Code, is neither warranted by the
language employed by the law-maker, nor does it harmonise with general prin-
ciples. As a general rule, to which there are a few exceptions, a party may
be compelled to do by the judgment of a court of justice, what he is not only
at liberty, but morally bound to perform voluntarily. But it is unnecessary to
argue this point, because it was not only expressly decided against the posi-
tion assumed by the counsel for the defendants in the case of *Chrétien* v. *Rich-
ardson*, but also in *Power's tutrix* v. *The Ocean Insurance Company*, and in *Ful-
ton* v. *Her Husband*, before cited. It must, therefore, be considered a settle
point in our jurisprudence.

Can the learned gentlemen be serious when they say, "if then the community sold, then there would be no *desistement de la vente*, because the vendor no longer existed, and the *desistement* can only take place between the contracting parties?" So that by the dissolution of the marriage by the death of one of the spouses the community vanishes?—there is no longer any community? If this be so, then surely all the protracted litigation with which our courts have been crowded for the purpose of settling communities after their dissolution has been an idle farce. But to be serious, it is obvious that the word community like that of succession, very often signifies the property of which it is composed, and until that property has been distributed among those who are entitled to it, the community, in that acceptation of the term, continues to exist. But what advantage can possibly be derived from a mere verbal criticism? What difference can result in the application of the doctrine of rescission of contracts or retrocession of property from the fact, whether the community, in the teschnical sense, still existed or had dissolved prospectively by the death of the wife ? In the latter case the rights of the wife are vested in her heirs, in the same manner and to the same extent as previous to her death they were vested in herself, with this single modification, that during her lifetime those rights were, to a certain extent, a mere expectancy, but by her death they have become absolute and certain in the hands of her heirs.

The ground on which the whole doctrine of rescission of contracts restsis well expounded by Judge Martin, in the case of *Mortee* v. *Roach*, Syndic, 8 L. R. 83, already cited. In the language of that great jurist, I say, the plantation and slaves were not the absolute property of *Stewart*, and his defeasable right to them being annihilated by the rescission of the sale, they have never ceased to belong to the community—or, if the counsel of the defendant prefer the phraseology—since the death of Mrs. *Packwood*, they have always been the joint property of *Samuel Packwood* and the heirs of his wife. He has succeeded, by a most erroneous judgment, to deprive some of those heirs of their just rights ; but I am sure that this honorable court will not enable him to deprive the present plaintiff of its rights.

There is but one more objection which I deem it necessary to notice. It is said that the heirs of Mrs. *Packwood* were not bound to warrant *Stewart's* title, and therefore they cannot set up any pretention to the title of the property on its retrocession. Nay, the eloquent counsel for the defendant, exclaim— "Would they not have laughed to scorn any claim made against them as vendors? and if so, how can they possess the rights which the law gives to vendors alone?" What relevancy this discussion has to the case before the court is not so very apparent. It will be time enough to discuss and decide the question of warranty when it arises; for that question, whether it be decided in one way or the other, cannot exercise the remotest influence on the proper decision of the question before the court. But suppose it was otherwise, is it not somewhat strange that gentlemen learned in the law should boldly assume a position so utterly untenable on the plainest principles of law? When the heirs of Mrs. *Packwood* accepted the community of acquets and gains which had existed between their ancestor and her husband, they became liable for the payment of one-half of all the community debts. Now suppose *Stewart* had been evicted from the plantation by a paramount title after the death of Mrs. *Packwood*, and the acceptance of the community by her heirs, would they not have been responsible to him for one-half of the price paid by him ? No, say the learned gentlemen, such a claim would have been laughed to scorn ! But I apprehend that they might have laughed as much as they pleased, but they would have discovered the application of the adage *rira bien qui rira le dernier*. We are gravely told that they would not have been bound to warrant *Stewart's* title because after Mrs. *Packwood's* death, her husband inherited the notes or money representing the price. But what effect could that produce on the legal rights of *Stewart* growing out of the contract of the sale of community property situated in Louisiana? This contract, although entered into in New York, was of course governed by the real statute of Louisiana. By that law warranty is of the nature of the contract of sale. On whom is that obligation imposed? On the vendor? Who was the vendor of the plantation to *Stewart?* It was *Samuel Packwood*, acting as the head and master of the community, and by the acceptance of that community after its dissolution by the death of his wife by her heirs, those heirs became as much vendors as if

AUGUSTA INS. CO.
*v.*
PACKWOOD.

their names had been inserted in the contract of sale itself; and of course they subjected themselves to all the obligations imposed by the contract. Who may have received the price or what may have become of it is perfectly immaterial. Whether *Samuel Packwood* threw it into the Mississippi or squandered it in any other way, cannot release the heirs of his wife from the obligations incurred by them by the acceptance of the community. Nor is it of any importance whether the notes belonged to him at the death of his wife, or whether these notes were a part of the community before her death or not. It is obvious that the source of the obligations of the heirs of Mrs. *Packwood* is the contract of sale, and will it be seriously contended that those obligations could be extinguished or modified *quoad Stewart*, by the direction that might be given subsequently to the proceeds of the sale, whether by the operation of law or by the aid of other parties without the consent of *Stewart?*

I have thus far argued this case on the hypothesis that the community of acquets and gains continued after the removal of *Packwood* and his wife from Louisiana, in 1836, so far as the property then acquired was concerned, and that it was dissolved only with regard to future acquisitions, as decided by the old Supreme Court in the case reported in 12 Robinson's Rep., 359. But such I humbly conceive is not a correct exposition of the community law of Louisiana.

The community of acquets and gains is the creature of the law of Louisiana, and is entirely unknown to the legislation of every other State of the Union. The law regulating it is a real statute operating immediately and directly on the property itself, and can of course have no extra territorial effect. On what ground, then, can it be contended that the interest of the wife in the community property, can be divested by the removal of the spouses from this State? To say, that although the community is dissolved, by that removal as to all future acquisitions, but that it continues to exist as to the property acquired during their residence in this State, and that the husband as the head of the community, retains the right of selling such property, is a gross and palpable fallacy. The community, which had its inception by the effect of a real statute, from the moment the parties moved into this State, naturally ceased to exist from the time when their removal from Louisiana exempted them from the dominion of its laws. From that period, the legal partnership was dissolved, and the property acquired during its continuance, was held by the spouses in common, subject to the payment of the community debts. The power of the husband to sell the community property is given to him by the laws of this State, as an incident to the community, and it must therefore necessarily be limited to the duration of the community. That this is the correct view of the subject seems to me to be too clear to admit of a doubt. If so, what becomes of the argument that the notes given by *Stewart* were *Samuel Packwood's* individual property?

*Benjamin & Micou* and *Bradford* and *Hennen*, for defendants.

The third question which arises in the cause is the effect of the retrocession made by *Stewart* to *Packwood*. It is contended by plaintiff that this retrocession places the plantation in the same condition as if it had never been sold, and that it became again the property of the community which owned it when it was sold.

It might be sufficient to rely on the authority of the decision already made in this cause in 12 Rob. Rep., 366, and on the reasoning of Judge Bullard, then the organ of the court. But that decision is so strenuously impugned by the opposing counsel, that we deem it our duty to offer such further arguments in its support as have been suggested by our examination of the cause.

It is to be observed that the sale by *Packwood* was made by consent of his wife: that it was made in New York: that the price was there received by the husband with the wife's consent, whilst both husband and wife were domiciled in New York, and that at the wife's death the notes which formed the consideration of the purchase, were in the husband's possession in New York, and, by the law of that State, were his personal and exclusive property. But admitting, for the sake of argument, that these notes were not the separate and exclusive property of *Packwood* at his wife's death, and that one-half of them belonged to her succession, it is perfectly clear that they formed no part of her *Louisiana succession;* that their *situs* was in New York, and that *Packwood* cannot be called on in Louisiana to account for the administration of his wife's New York estate. The domicil of his wife having continued in New York for four years before her death, that was the proper place for the opening of her suc-

cession and that was the principal administration, the administration in Louisiana being merely *ancillary :* this principle is familiar and was fully recognised in the case of *Gravillon* v. *Richards*, Exr., 13 L. R., 297, where the authorities are cited.

If this principle be correct, it follows, that even on the supposition of Mrs. *Packwood's* having died in the ownership of the moiety of the notes, the only right of an heir is to require of *Samuel Packwood* in New York, to render an account of her half of the notes. If he has used her half in acquiring the possession or ownership of property, which belonged to a third person at the date of her death, he may be responsible for the conversion of her assets to his own use ; but, surely, it cannot be pretended, that the title to the property so acquired enures to the heirs of those assets. It is not believed that a case can be found in the books, in which it has ever been contended that real estate purchased by a trustee, vests in the *cestui que trust,* · for the mere fact of the trustee's using trust funds in making the purchase. *Packwood* had no right to acquire real estate for the heirs of his wife—to invest their assets in a plantation and slaves; and if he had taken a reconveyance in their names, his act would have been utterly null and void, as made without a semblance of authority. How, then, can it be pretended, that in acquiring title in his own name for his individual account, he really bought for them ; and still further, how can it be pretended, for a moment, that after the title was recorded in his name and he had conveyed to third persons, innocent and ignorant of the facts, they can be divested of their title, in favor of an heir, who may choose to say, that he adopts *Packwood's* act in taking the retrocession, and elects to consider it as conveying a title to himself?

But, independently of these considerations, there is an error lying at the very foundation of the position assumed by the plaintiff's counsel. It is assumed by them, that there was a simple rescission of the sale, by agreement, between vendor and vendee—that there was what the French lawyers call a "*désistement.*" The evidence in the cause, shows this assumption to be entirely erroneous. The sale was consummated by a delivery, and *Packwood* received an account of the price, under attachment proceedings, the sum of $4,192 55 from *Lambeth & Thompson*, and $9,157 27 from *T. J. Packwood.* In addition to these payments, *Stewart* deposes, that *Packwood,* having obtained a judgment against him for a part of the price, it was agreed that he should pay to *Packwood* $2,800, and execute a sale of the plantation to him, and that *Packwood* should return the notes given for the price.

So far, then, from a simple rescission of the sale having been agreed on, *Stewart* gave *Packwood* a transfer of the plantation and a sum of $2,800, in addition to the amounts recovered from the garnishees, as a consideration for the return of his notes. It is an utter perversion of facts and of the plain meaning of language, to call an agreement of this kind, a simple rescission of a sale, which replaces the parties in the same position, as if a sale had never been made. The Code, art. 2040, defines the resolutory condition as that, which, when accomplished, operates the revocation of the obligation, "placing matters in the same state as though the obligation had not existed." But the art. 2041 provides as follows : " A resolutory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagements—in this case the contract is not dissolved of right. The party complaining of the breach of the contract, may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance."

The contract between *Stewart* and *Packwood* was not dissolved at all, neither of right, nor by agreement, but there was a re-sale for a new consideration, different from that of the original sale.

This point is discussed by *Pothier*, with his usual lucidity, in his treatise "Des Fiefs." By the feudal law, the lord of the manor was entitled to a certain duty on all mutations of property, which, under the customs of Paris and Orleans, amounted to one-fifth of the price, and was called "profit de quint." A question, therefore, frequently arose between the Seigneur and the vassal, · whether or not there had been a real mutation. *Pothier* in this treatise discusses the question whether there was due to the Lord this *profit de quint* when the vendor took back the property, because the vendee had not paid. The solution of this question evidently depends on the fact, ·whether there was

a simple rescission of the former sale—a mere annulling of the first contract—or whether there was a new contract of sale by the original vendee to the original vendor. He says, then, after laying down the rule, that on a simple rescission of the original sale, the duty is not due:

"Pour que le vendeur, qui rentre dans son héritage, ne doive pas un nouveau *profit*, il faut qu'il y rentre *précisément pour le même prix qu'il l'a vendu;* car, si la convention qu'il a eue avec l'acheteur pour y rentrer, contient quelque différence dans les conditions avec le premier contrat, cette convention, dès lors, ne peut plus passer pour un simple désistement de ce premier contrat, mais elle forme un nouveau contrat de vente qui doit opérer un nouveau profit."

But there is still another difficulty, which plantiffs will find insurmountable, in the attempt to apply their doctrine of retroactivity, in this case. There can be no retroactive effect, unless the parties to the sale and its rescission be the same, and in the same quality. Now, *Samuel Packwood,* in his sale, according to the theory of plaintiffs, acted as head of the community, and sold for the community. But, at the date of the re-sale, there existed no community, and it is, therefore, impossible that there could be a retroactive effect. Take the case of any two parties, instead of that of husband and wife; they sell for notes—one dies—the other purchases the property back in his own name from vendee. Can any one pretend that the heirs of the deceased became joint owners, by virtue of this purchase by the survivor in his own name, even admitting him to have wrongfully converted his deceased partner's share of the price to his own use for the purpose of obtaining the re-sale? Clearly, not! and if authority be wanted on this point, *Pothier* again comes to our aid:

" Mais si le vendeur avait cédé ou légué la créance du prix à un tiers, et que l'acheteur abandonnait à ce cessionaire ou légataire l'héritage pour être quitte du prix de la vente, cette convention serait une nouvelle vente qui opérerait un nouveau *profit.* Car cette convention ne pourrait passer pour un désistement du premier contrat de vente, ce désistement ne pouvant se faire qu'entre les parties contractantes." Pothier loco citato.

If then the community sold, then there could be no *désistement de la vente,* because the vendor no longer existed, and the *désistement* can only take place between contracting parties.

The right of rescinding a sale for non-payment of the price can only exist in the party having a right to demand the price. Now if it be once admitted (and this whole branch of the argument proceeds on this admission), that there was a real sale to *Stewart* by *Packwood* and that *Packwood* was in lawful possession of the notes at the death of his wife, it is quite obvious that his wife's heirs had no right to demand the price from *Stewart.* Then how is it possible that they who could not ask *Stewart* to pay the price, can become owners of property which was only given up by him because he was in default for the payment of that price. As the judge below well puts it in his reasoning, were the heirs of Mrs. *Packwood* bound towards *Stewart* as his vendors—could he have exercised any claim against them in the event of eviction? Would they not have laughed to scorn any claim made against them as vendors? and if so, how can they possess the rights which the law gives to vendors alone?

Both on reason and authority we consider the former decisions in this controversy as unimpeachable and rely confidently on the affirmance of the judgment in favor of defendant.

See case, No. 2,872, *Johnson* v. *Weld,* decided 26th April, 1853.

SLIDELL, C. J. (VOORHIES, J., and CAMPBELL, J., concurring.) I have doubts whether, under the circumstances of the case, the notes having been received by *Packwood* in New York, where he and his wife were then domiciled, and being there in his possession after her death, a half interest in them vested in her heirs. Assuming, however, that such an interest, vested in her heirs on her death, grave difficulties remain.

I concede that this matter is not *res judicata* against Mrs. *Morton.* But this very subject of rescission of the sale to *Stewart,* has been solemnly decided by the Supreme Court, after elaborate argument, in the case of *Packwood's* succes-

AUGUSTA INS. Co.  sion, 12 Rob., 369; and to overrule their decision, upon the faith of which
*v.*
PACKWOOD.   parties have acted and rights have been acquired, is a very grave thing and
ought not to be done unless that decision be manifestly erroneous. This
I am not prepared to say. To effect a rescission of the sale, so as to replace
parties in the same position as if a sale had never been made, the parties to
the sale and the rescission should be the same. But on the death of his wife,
*Packwood* ceased to represent the community, and he did not even profess to
represent it or the heirs of his wife, but took the title in his own name and for
his individual account. Even if he had taken the title in the name of himself
and his wife's heirs, it would have been an unauthorized act, and not binding
on them. But, I repeat, he did not do even that. He took the title to himself,
and the recourse of his wife's heirs against him, if any they have, is to make
him account for their funds converted to his own use.

I understand the opinion of Mr. Justice Ogden, as conceding the title was
not in the heirs, unless they chose to adopt and ratify the unauthorized action
of *Packwood.* But if they could so adopt and ratify, ought their election under
. the circumstances to retroact so as to defeat the title previously acquired by
*White* and *Trufant?* It seems to me it should not.

I am therefore of opinion that the judgment should be affirmed.

OGDEN, J., dissenting, with whom concurred BUCHANAN, J. The material
facts which gave rise to the important questions presented in this suit, may be
found stated at length in the reported cases of *Succession of Alice Packwood,*
9 Rob. Rep., 438; *Succession of Packwood,* 12 Rob. Rep., 334, and *Morton et
al.* v. *Packwood et al.,* 3 Ann., 170.

The present plaintiffs are the assignees of the rights of *Mary* and *Ann Pack-
wood,* wife of *George C. Morton,* and one of the heirs of *Alice Packwood.* She
was one of the parties in the case referred to of *Morton et al.* v. *Packwood et
al.* In that suit she, in conjunction with her co-heirs, all children of *Alice
Packwood,* set up a claim against the defendant, their father, to recover seven-
tenths of an undivided moiety of a plantation called Myrtle Grove, and slaves,
in the parish of Plaquemines, alleged to belong to the community which existed
between their father and mother. The claim was resisted by a plea of *res ju-
dicata,* which was sustained in regard to all the plaintiffs except Mrs. *Morton,*
and her assignees have now revived the suit for that portion of the one un-
divided moiety of the property to which she would be entitled if it is held to
belong to the community. The grounds on which the claim in this case rests,
are the same in every respect as those which are made the basis of the claim
heretofore set up by the co-heirs of Mrs. *Morton,* and which was decided ad-
versely to them in the case referred to of the *Succession of Packwood,* decided
in 12 R. R.

The plaintiffs allege that *Packwood* and wife were married in the State of
Connecticut, and in 1804 they removed to the State of Louisiana, where they
resided until 1836, when they removed to New York, and while residing there
Mr. *Packwood* died in 1840. That while they resided in Louisiana, they ac-
quired a large property, all of which belonged to the community. That, on the
23d of May, 1840, *Packwood* sold the property in controversy, belonging to the
community, to *David Stewart,* of Baltimore, for $100,000, payable in six equal
instalments, for which notes were given. It is averred this sale was simulated,
and did not change the title to the property. It is further alleged that if it was
a real sale, the property reverted to the community by virtue of a retrocession

of the property to *Packwood*, made by *Stewart* on the 27th of July, 1843, in AUGUSTA INS. CO. consideration of the return of the six notes which he had given for the price.

*v.*
PACKWOOD.

*Oliver & Truefunt*, purchasers of the property from *Packwood*, since its retrocession to him by *Stewart*, and the other heirs of *Alice Packwood*, are made defendants in the suit, and several grounds of defence are set up, which we shall notice in the order in which they are presented.

The first, is the plea of *res judicata*, which it is attempted to sustain, by showing that in 1844 some of Mrs. *Morton's* co-heirs presented a petition calling on *Packwood*, as executor of his wife, for an account; which account was rendered and duly advertised. That an opposition was made to it by the other heirs, on the grounds of the present action, and that the opposition was overruled, and the judgment overruling it sustained by the Supreme Court, on appeal. Mrs. *Morton* was not cited in those proceedings; she was in no manner a party to them; and her rights could not be in any manner affected by the judgment homologating the executor's accounts. It is contended that the executor had a right to consider Mrs. *Morton* constantly in court as regarded all proceedings conducted by the counsel of *Packwood*, because his counsel were also the agents and counsel of Mrs. *Morton*, and instructed not to oppose his claims. I am not aware that such a purely constructive presence in court, as that would be, has ever been held to constitute a person a party to a suit. The principle is well settled that either a citation to appear or an actual appearance in court is indispensable to affect the rights of a party by judicial proceedings, except in the case of creditors, where the law has declared public advertisement of notice to them to oppose an account equivalent to citation. The plea of *res judicata* is entirely unsupported.

The next ground of defence is that of estoppel. It is urged that if the circumstances do not justify the plea of *res judicata* in its technical sense, yet the plaintiffs, as assignees of Mrs. *Morton* are estopped from asserting this claim, because the adverse rights of *Samuel Packwood* were set up by her agent, with her consent and direct approval. To sustain this branch of the defence, counsel have called our attention to three letters in the record. The first is a letter from Mrs. *Morton's* husband to *Henry Lockett, Esq.*, dated 17th October, 1840, in which he says that at the request of his father-in-law, *Samuel Packwood*, he encloses him a power of attorney from Mrs. *Morton* and himself, to represent them in the division of the estate, and makes enquiry whether his wife is entitled to half of certain bank stock of Mr. *Packwood*, and to any monies deposited in bank, previous to his wife's death. A reply to that letter is written by *Lockett & Micou*, as follows:

"We find that some of the other heirs of Mrs. *Packwood* who have a common interest with you, have employed separate counsel, and that questions are likely to arise between them and Mr. *Packwood* in the settlement of the estate. As we are specially engaged by Mr. P., you will perceive that the acceptance of your procuration might involve us in the representation of opposing interests; Mr. L. would, therefore, prefer that you should send a power to some other person."

On the 5th December, 1840, Mr. *Morton* replies:

"Your favor of 28th ult. has been received, and I duly appreciate the motives of honorable delicacy under the influence of which it was written. This only serves to confirm me in the selection of you, Mr. *Lockett*, as the agent of Mrs. *Morton*, and I beg, therefore, that the power may be executed according to my

original instructions. I beg to add, that it is the wish of Mr. *Packwood* you should act, and that neither Mrs. *Morton* nor I will, in any event, allow our relations to Mr. P. to assume a hostile attitude in the case, or our action or interest to come in conflict with his."

Under these instructions, *Henry Lockett* presented his petition to the court on the 17th March, 1841, praying the recognition of Mrs. *Morton* as heir, and of himself as her agent; and a judgment was entered accordingly on the 31st of the same month.

*Lockett & Micou* also acted as the attorneys of *Samuel Packwood* as executor of his wife, and on their petition as such, an inventory of the succession was ordered, and made on the 24th December, 1841. On the making of this inventory, *Henry Lockett* appeared as agent of Mrs. *Morton*, and signed it. The inventory did not contain any reference to the Myrtle Grove plantation, or its crops; and on this ground *Dorsey & Neville*, representing two other heirs, protested against it. But Mrs. *Morton* did not join in the protest, and the inventory was homologated by a judgment of the court.

These are the material facts from which it is urged that it would be contrary to equity and good conscience for Mrs. *Morton* to set up a claim to this property against *Oliver & Truefant*, who, it is said, had a right to suppose when they became the purchasers of the property that, from these acts of Mrs. *Morton* and her husband, they did not pretend to any claim whatever on the property. Considering that, when the above letters were written, the retrocession of the property from *Stewart* to *Packwood* had not been made; considering that the right now set up, if existing, is purely the creature of the law, I am at a loss to comprehend why the willingness of Mrs. *Morton*, at the instance of her father, to employ for herself the same counsel employed by him, should involve her in the loss of her rights, by the silence and inaction of herself or her agents. These pleas being disposed of, it remains to consider the question of title presented by the facts, as before stated.

There is no evidence whatever of the deed from *Packwood* to *Stewart* being simulated. The stipulation which is proved to have existed, securing to the purchaser the privilege of canceling the sale at any time before the final payment of the whole purchase money, upon a proper allowance of indemnity to *Packwood*, the seller, did not render the contract null. The right to cancel the sale depended upon a proper allowance of indemnity to *Packwood*, and this was not a potestative condition. Touillier, vol. 6, 497. Duranton, vol. 2, No. 30. The last and most important question in the cause, is the effect of the act of retrocession made by *Stewart* to *Packwood*. The case decided in 12 Rob. R, is direct on this point, and if the decision is correct, it settles the controversy. The learned Judge, now deceased, who was the organ of the Court when that decision was made, uses the following language: "There is no doubt that in cases of retrocession, properly speaking, the effect is to re-invest the title, as if no alienation had taken place; but that presupposes that the capacities of the contracting parties remain unchanged. Now, according to the pretensions of the heirs of Mrs. *Packwood*, her right to one-half of the notes, representing the price of the plantation, became, on her death, irrevocably vested in her heirs; and we repeat that *Packwood* ceased to represent a community and the heirs of his wife."

From these premises, is it a legal conclusion that the retrocession did not have the effect which it is admitted by the Court it would otherwise have had, of re-investing the title, as if no alienation had been made? As *Packwood*, at the

death of his wife, was still in possession of the notes given by *Stewart* for the <span style="float:right">AUGUSTA INS. CO,<br>*v.*<br>PACKWOOD.</span> price of the plantation, the heirs of his wife were seized, immediately on her death, with the right to an undivided moiety of those notes, unless the fact of the removal of the residence of *Packwood* and wife to New York is to be considered as producing a difference in the rights of the parties, but I cannot see why such an effect should be produced. The plantation and slaves in Louisiana, it is admitted, continued to belong to the community, notwithstanding the removal; the notes represented the price of the property, and the community must be considered entitled to the price, as being the owners of the property sold. It is true that if the price had been paid, and had gone into the hands of the husband, before the death of his wife, he could have disposed of it as he pleased, and would have owed no account to the heirs; but as the price remained unpaid, the heirs of the wife had the same right to the price that they would have had to the property if it had never been sold.

When *Packwood* sold the property, although as head and master of the community, he had a right to sell it, even without the consent of his wife; yet he sold it for her as well as for himself, because it was common property. If she had been living when the sale was canceled, on account of the non-payment of the price, *Packwood* would have been considered, in the eye of the law, representing his wife, as partner in community, in the act of retrocession as well as in the original sale; but the wife died before the retrocession, and her heirs became immediately seized of her rights. Why should a different effect be produced, because the moiety of the price then belonged to the heirs instead of to the wife? Under that change of circumstances, without the consent of the wife's heirs, *Packwood* was perhaps incompetent to make the contract of rescission; but as only half of the price of the property belonged to him, and the consideration for rescinding the sale, was the canceling of all the notes constituting the whole price, he must be considered as having undertaken to represent the heirs of his wife, and as having their title re-invested, as well as his own. By claiming the property, the heirs ratified the act. The legal consequences of the rescission of the sale, which fix the character of the title to the property, seem to me to be entirely independent of the right of *Packwood* to represent the heirs of his wife. If it be one of these consequences of a rescission of the sale, on account of the failure of the purchaser to pay the price, to replace the parties in the same situation as if the sale had never taken place, it follows that the property, when retroceded to *Packwood*, must be considered as held by the same title as that by which he possessed it, at the date of the transfer to *Stewart*, which was a title in community.

On this subject, Touillier, in his Treatise on Obligations, says, that rescissions and even dissolutions of contracts, for a cause, going back to the origin of the agreement, are not considered as alienations properly so called, but rather as a return to the former ownership which has not ceased to exist, or was only suspended. This principle he applies to the case of a dissolution of a sale for want of payment of the price, which he says is a cause going back to the origin of the contract, as the sale is always made under the condition expressed or implied, that the price shall be paid. See Touillier, vol. 4, Nos. 539, 548 and 550. Table 3, *Contracts et Oligations conventionable.*

The article 2040 of the Civil Code, declares that the dissolving condition, when accomplished, operates the revocation of the obligation, and places matters in the same state as though the obligation had not existed. *Packwood* had a

Augusta Ins. Co.  right to claim the dissolution of the sale, by virtue of that dissolving condition,
*v.*        implied in all commutative contracts, and the effect spoken of in Art. 2040, as
Packwood.   necessarily results from an agreement to rescind the sale for that cause, as
from a judgment decreeing the rescission. *Fulton* v. *her husband,* 7. R. R., 75 ;
*Martee* v. *Roach's Syndic,* 8 La. R., 83 ; *Power,* Tutrix, v. *Ocean Insurance
Company,* 19 La. R., 30 ; *Chrétien* v. *Richardson,* 7 Ann. R., p. 2 ; Touillier, 12
V. No. 195.

It is contended by defendant's counsel that the contract between *Packwood*
and *Stewart* was not a rescission of the sale, but a re-sale for a new considera-
tion : that a sum of $2,800, in addition to certain sums recovered by suit, toge-
ther with the property, was given by *Stewart* to *Packwood,* as a consideration for
the return of his notes. *Stewart* had enjoyed the revenues of this plantation
from the time of the sale, in 1840, until July, 1843. These revenues he was
bound to return, as one of the effects of his failure to pay the price, and the
consequent rescission of the sale. The evidence satisfies me that all the money
paid by *Stewart* formed part of the revenues received by him from the property ;
and from a letter of *Packwood* to his counsel, it is evident that the $2,800 was
paid only as compromise or settlement of the amount thus due by *Stewart.* The
argument which has been urged, that, at most, *Packwood* could only be viewed in
the light of a trustee for the heirs of his wife, having used their half of the price in
procuring the retrocession from *Stewart,* assumes that it was a purchase of the
property from *Stewart,* when according to my opinion, it was merely an act re-
instating *Packwood* in his original title. His vendees were bound to ascertain
the nature of that title, at the date of the transfer to *Stewart,* and they incurred
only the same risk which every purchaser, under our system of community
incurs, as the title to property of the community is generally taken in the name
of the husband alone, it being, in my opinion, the legal effect of the rescission
of the sale to *Stewart* to place the title where it originally was in the community,
the title of the heirs of Mrs. *Packwood* must be considered as a legal and not
merely an equitable title ; but if it were properly to be regarded as an equitable
title only, *Oliver & Truefant* were not purchasers without notice, as the deed to
them, on its face, discloses the existence, in my opinion, of such a claim.

I conclude that the plaintiffs are entitled to recover the property claimed in
their petition ; and that the judgment of the Court below ought to be reversed
and the cause remanded, to settle the question of rents and profits.

BUCHANAN, J. I concur in the above opinion of Justice OGDEN.

Re-hearing refused.